Filed 2/11/15  P. v. Devries CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMY M. DEVRIES,<br><br>    Defendant and Appellant. | H039641<br>(Santa Clara County<br> Super. Ct. No. F1139242) |

A jury found defendant Jeremy M. Devries guilty on ten counts of forcible lewd or lascivious acts on a child (Pen. Code, § 288, subd. (b)) and three counts of aggravated sexual assault on a child—sexual penetration by a foreign object (Pen. Code, §§ 269, 289, subd. (a)).[1]  At sentencing, the trial court imposed an aggregate term of 105 years to life and issued a restraining order prohibiting visitation between defendant and the victim during the period of confinement.

On appeal, defendant contends:  (1) the victim's testimony was too vague and generic to support the convictions; (2) the trial court erred by allowing the victim's brother to testify under Evidence Code section 1108 about defendant's prior misconduct; (3) the trial court erred by excluding evidence that the victim had fabricated a claim

_____

[1] Subsequent undesignated statutory references are to the Penal Code.

against her father; (4) the sentence of 105 to life constitutes cruel and unusual punishment; and (5) the restraining order was unauthorized.

We conclude the victim's testimony was sufficient to support convictions on four of the ten counts under section 288, subdivision (b), and all three convictions under section 269. Because we must remand for resentencing, defendant's claim of cruel and unusual punishment is moot. We also conclude the restraining order was unauthorized. We find all other claims without merit. We will reverse and remand with instructions to strike the convictions on six of ten counts under section 288, subdivision (b), and to strike the restraining order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Background*

The charges alleged conduct occurring from 1997 to 2000, when defendant was between 18 and 21 years old. At the time of the offenses, the victim, J. Doe, was between four and seven years old. Her older brother Carlos was between 10 and 13 years old. J. and Carlos are defendant's cousins; defendant's mother is half-sister to J. and Carlos' mother. Both families lived in the Gilroy/Morgan Hill area and spent time at each others' homes, although the timing and nature of the visits were disputed at trial.

The Doe family lived in a house on San Miguel Street in Gilroy until 1995 or 1996, when they moved to a house on Eagle View Way. The Devries family lived in a house on Barcelona Court in Morgan Hill until December 1999, at which time they lost their home. For about six to eight weeks in 2000, the Devries family lived with the Doe family at the Does' house on Eagle View Way. Defendant and his mother denied that defendant was included in this living arrangement, but J., Carlos, and their parents all testified that defendant lived with them during this period. Carlos and his parents testified that Carlos shared his bedroom with defendant, and that the two slept together in a queen-sized bed.

2

Around June 2002, Carlos told his parents that defendant had sexually molested him during the 1997 to 2000 period. Following a police investigation, defendant pleaded no contest to one count of a lewd or lascivious act on a child under 14. (§ 288, subd. (a).) About eight years later, in 2010, J. disclosed to her parents that defendant had previously molested her as well, leading to the charges at issue in this appeal. When the case went to trial in March 2013, J. was 19 and Carlos was 25. Carlos testified at J.'s trial under Evidence Code section 1108.

A. *Testimony of Carlos Doe*

Carlos recalled defendant babysitting him at the Does' house on San Miguel Street when Carlos was young. Defendant first touched Carlos's genitals when Carlos was seven or eight. Defendant would tell Carlos to pull out his penis, and defendant would take his out too "to make it seem like not such a big deal." Sometimes defendant would put his penis in Carlos' mouth. Defendant would instruct Carlos to touch defendant's penis to make him "feel [a] certain way." This behavior continued as Carlos reached the ages of nine and ten. Carlos also recalled visiting defendant at the Devries' residences over the years. Carlos recalled defendant touching him and making him do things at the Devries' house on Barcelona Court.

The Does moved to the house on Eagle View Way after Carlos completed the third grade. Around 1999, after defendant's stepfather died, the Devries family moved in with the Does at the house on Eagle View Way, and Carlos' mother made Carlos share his bedroom with defendant. Defendant sodomized Carlos twice at that house. The last time defendant did anything to Carlos, he was 11, 12, or 13 years old. Carlos had tried to tell his mother about the molestations, but he did not know what words to use, and she did not understand.

In June 2002, Carlos again told his parents about the molestations. He had been getting in trouble in high school, and his parents were "coming down on [him] really hard one time at dinner." Carlos snapped, and grabbed a kitchen knife to stab himself. His

3

father physically forced Carlos onto the ground, and he broke down emotionally, whereupon he "told them what [he] had been holding inside for all those years."

B. *Testimony of J. Doe*

J. recalled the Devries family, including defendant, spending time at the Does' house on Eagle View Way when she was young. She also recalled going to the Devries' house located on a courtyard in Morgan Hill when she was between three and six years old. There were times when defendant babysat J. alone. She recalled being "touched inappropriately" by defendant at the house on the courtyard, but she could not recall how old she was the first time it happened because she was too young at the time. In response to the prosecutor's questions, J. testified as follows:

"[Q:] Would the touching take place on a regular basis starting at Barcelona? How old do you think you were the first time it happened?

"[A:] I don't know. I was really young.

"[Q:] Okay. If you cannot tell us, that's fine.

"[A:] Okay.

"[Q:] But you remember being young and being touched inappropriately?

"[A:] Yes.

"[Q:] And it happened the next year? During the next year, the touching continued?

"[A:] Yeah. I mean, it happened for a really long time. At that time, I didn't know years from days.

"[Q:] You weren't sure how old you were but the conduct continued for—maybe you were five years old when it happened?

"[A:] Yes.

"[Q:] Six years old, it continues to happen?

"[A:] Yes.

"[Q:] Seven years old it continues to happen?

"[A:]  (Nodding.)"

The last time defendant touched J. inappropriately, they were at the Does' house on Eagle View Way, during the period when the Devries had moved in.  Defendant put his finger inside the lips of her vagina, causing her pain.  He left bruises on her legs, and she had blood on her underwear.  When J.'s mother discovered the blood, J. told her mother the blood and bruises were caused when she hit her crotch on her bicycle.

J. could recall a total of three incidents—including the above incident—in which defendant put his fingers inside her vaginal lips.  J. testified that it could have happened more than three times, but that she had "three independent memories" of it happening.  These incidents happened when she was between five and seven years old.  She testified that one incident occurred when the Devries had moved in with her family; she did not testify as to where the other two incidents happened.

J. testified that defendant touched her "in other ways" lots of times over the years.  Sometimes he would touch her vagina without putting his fingers inside.  This happened "a lot."  It happened when J. was five and six years old.  It also happened when she was seven, "[b]ut not as much."  In response to the prosecutor's questions, J. testified as follows:

"[Q:]  Okay.  And could you even begin to tell us how many times he touched your vagina without putting his fingers inside?

"[A:]  I couldn't give an amount.

"[Q:]  Okay.  Dozens and dozens?

"[A:]  A lot.  Enough to not be able to keep count or remember specific times.  It just keeps happening."

Most of the touching took place at the house on the courtyard in Morgan Hill, but it also happened at Eagle View Way.  The prosecutor questioned J. about how many times defendant touched her at each location:

5

"[Q:] How many times do you think it happened just at Eagle View during the whole time period?

"[A:] Not very much.

"[Q:] Okay. Five times? Ten times?

"[A:] Probably less.

"[Q:] Okay. Less than five? Okay. How many times do you think it happened at Barcelona over those years?

"[A:] I can't count."

On cross-examination, J. testified that when defendant first began molesting her, she was "Maybe three, maybe younger." In a subsequent exchange on redirect examination, J. testified as follows:

"[Q:] And defense counsel asked you when she first started and you thought it began when you were about three and ended when you were about seven. Does that sound right?

"[A:] Yes.

"[Q:] He molested you when you were four?

"[A:] Through the time, yeah.

"[Q:] Molested you when you were four?

"[A:] Yes.

"[Q:] Molested you when you were five?

"[A:] Yes.

"[Q:] Molested you when you were six?

"[A:] Yes.

"[Q:] Molested you when you were seven?

"[A:] Yes.

"[Q:] The last event was when you were seven, and that's when he fingered in your vagina, causing you to bleed on your underwear?

"[A:] Yes."

At the house on Barcelona Court, the touching usually happened in defendant's bedroom. J. sometimes went into defendant's bedroom voluntarily. She was attracted to his toy model cars, which he would not let her touch. Sometimes she was scared, but sometimes she was distracted by the cars. Sometimes, defendant would tell J. that if she did not let him touch her, he would do the same thing to Carlos. He said this "a few times" over the years. After the first time he told her this, the touching happened "a lot of times."

Defendant instructed J. not to tell anybody about the touching incidents, and he warned her she would get in trouble if she did. He would sometimes give her "gummy worms"—a type of candy—after touching her. This happened at defendant's house on Barcelona Court. The candy was kept in a drawer in the kitchen.

Most of the time J. struggled against defendant, trying to get away. Defendant would physically bring her back into his bedroom with his hands, or put her in a "time out" as if she had done something wrong. He would grab her ankles, feet, or legs to restrain her. At the house on Barcelona Court, she once suffered bruises on the back of her thighs after an "episode" with defendant. Sometimes, she did not struggle against defendant. On one occasion, defendant tied J. to a chair and put her in a closet in the hallway, but he did not molest her on that occasion.

J. testified that at the house on Eagle View Way, she caused herself to black out by falling from an overhang in her parents' bedroom; she landed on the back of her head. She was trying to make herself forget what had happened to her. By that point, her mother had found out what had happened to Carlos, so her mother asked J. if it had also happened to her. J. denied being molested because she knew her mother would be hurt.

J. disclosed the molestations to her parents when she was 17 years old. She came home late at night after she had been drinking, and her parents became angry with her. In the ensuing discussion, she revealed she had been molested when she was a child. The

next day, when the discussion continued, she told them defendant was the person responsible.

C. *J.'s Parents' Testimony*

Both of J.'s parents testified for the prosecution. They testified that defendant visited their house on San Miguel Street for family gatherings and to babysit Carlos and J. The Doe family frequently visited the Devries family at their house on Barcelona Court. And defendant babysat J. at the house on Barcelona Court. After defendant's stepfather passed away, the Devries family moved in with the Doe family at Eagle View Way. Defendant stayed with Carlos in his bedroom. At the house on Eagle View Way, J.'s mother once discovered blood on J.'s panties, and her legs were bruised. J. said she had fallen off her bicycle.

They also testified that Carlos disclosed to them in June 2002 that defendant had molested him. They tried to keep this information hidden from J. However, several years later, J. disclosed that defendant had molested her as well. J.'s parents urged her to talk to the police, but it took several months to convince her to do so.

D. *Defendant's Testimony*

Defendant testified on his own behalf and denied that he had molested either Carlos or J. He conceded that he had pleaded no contest to committing a lewd or lascivious act against Carlos, but he testified that he did not completely understand what he was doing when he entered the plea. He explained that he was faced with a choice between probation and "go[ing] to prison for a very long time," so he chose the former. He felt that his defense counsel performed poorly, and that he had been "wrongfully advised."

Defendant recalled living at the house on Barcelona Court from April 1997 until around March 1998. For part of the summer in 1998, he lived with his girlfriend and her parents in Morgan Hill. He lived there until October 1998, when he moved back home. From mid-1999 to mid-2000, he lived with his godparents. After that, he and his

8

girlfriend lived at Quail Ridge apartments in Morgan Hill until 2004. He denied that he ever lived with the Does at Eagle View Way or that he ever spent the night there. He denied that he had ever shared a bed with Carlos.

Defendant agreed that the Doe family spent time with his family at the house on Barcelona Court, but he testified that they never slept over. He denied that his family spent time at the Does' residences. He testified that he helped babysit for the Does at some point in 1993 or 1994 while J. was still in a walker. At the time, he said, there was a "primary babysitter" who lived in the house with the Does. He never babysat for the Does when he was living at Barcelona Court.

Defendant denied there was a drawer in the kitchen at Barcelona Court containing gummy worms. His mother was diabetic, so there was a strict rule against candy in the house. He denied ever tying J. to a chair, and he denied that there was a closet in the hallway of that house.

On cross-examination, defendant admitted that he was charged in connection with making annoying phone calls in 2000, and that he was charged with domestic violence against his girlfriend. He admitted that he caused multiple bruises to his girlfriend's body during the domestic violence incident.

E. *Defendant's Family*

Defendant's mother, sister, and godmother testified for the defense. Defendant's mother denied that defendant lived with the Does at Eagle View Way during the period when she and defendant's sister had moved in with the Does. Defendant's mother denied that he had ever shared a bedroom with Carlos. She testified that defendant lived with his girlfriend at that time. Defendant's mother also testified that the Doe family rarely visited her family at Barcelona Court, and she denied that defendant ever babysat for J. or Carlos at that location. She testified that she never kept gummy worms in a kitchen drawer or any candy in the house because she suffered from diabetes.

9

Defendant's godmother testified that defendant lived with her from June 1999 until July 2000. Defendant was at her house on a daily basis. He did not babysit Carlos or J. during this period.

Defendant's sister testified that defendant did not live with them when she and her mother lived with the Doe family at Eagle View Way. Defendant's sister never saw defendant spend the night at the Does' house, and she testified that her mother never kept gummy worms in a kitchen drawer at the house on Barcelona Court because her mother was diagnosed with diabetes. She also testified that the house did not have a hallway closet, and that she never saw defendant babysit Carlos or J.

F. *Procedural Background*

The prosecution charged defendant in Counts One through Ten with committing lewd or lascivious acts on a child under 14 by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. (§ 288, subd. (b).) Counts Eleven through Thirteen alleged aggravated sexual assault on a child—sexual penetration by a foreign object. (§§ 269, 289, subd. (a).) With the exception of Count Thirteen, all counts alleged that the offenses occurred between December 3, 1997, and December 31, 2000. Count Thirteen alleged that the offense occurred between January 1, 2000, and December 31, 2000. The jury found defendant guilty on all thirteen counts.

At sentencing, the trial court sentenced defendant to an aggregate term of 105 years to life, composed of ten six-year terms for Counts One through Ten, plus three terms of 15 years to life for each of Counts Eleven through Thirteen, with all terms to run consecutively.

## II. DISCUSSION

A. *Sufficiency of the Evidence*

Defendant argues that J.'s "generic testimony" was too vague and general to constitute evidence sufficient to support his convictions, in violation of due process and

*People v. Jones* (1990) 51 Cal.3d 294 (*Jones*).[2]  The Attorney General contends that J.'s testimony was sufficiently specific under *Jones*.  We conclude the evidence was sufficiently specific to support Counts One through Four and Counts Eleven through Thirteen.

    1.  *Legal Standards*

"A judgment must be supported by substantial evidence in light of the whole record." (*Jones*, *supra*, 51 Cal.3d at p. 313.)  "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]" (*Id.* at p. 314.)

When presented with generic testimony from a victim of molestation, the victim's failure to specify precise dates, times, places, or circumstances does not necessarily render the testimony insufficient.  (*Jones*, *supra*, 51 Cal.3d at p. 315.)  "The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy).

---

[2] Defendant also argues that the standard for sufficient evidence set forth in *Jones* does not satisfy federal constitutional requirements.  We reject this claim; we are bound by the decisions of the California Supreme Court.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

11

Moreover, the victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Id.* at p. 316.)

2. *Sufficiency of the Evidence Supporting Counts Eleven Through Thirteen*

Defendant first challenges the sufficiency of the evidence supporting Counts Eleven through Thirteen, on which he was convicted of aggravated sexual assault on a child—sexual penetration by a foreign object. (§§ 269, 289, subd. (a).) To find defendant guilty on each count under section 269, the jury had to find that he committed sexual penetration by force, violence, duress, menace, or fear of immediate and unlawful bodily injury, and that the victim was under the age of 14 and at least ten years younger than him. Furthermore, under section 289, subdivision (a), the jury had to find that defendant accomplished an act of sexual penetration using a foreign object, and that the victim did not consent.

We conclude the evidence was sufficient to support the convictions on Counts Eleven through Thirteen. First, J. testified to the number of incidents of penetration. She clearly stated that she had "three independent memories" of such incidents. She testified in greatest detail about the last incident, which occurred at the Does' house on Eagle View Way, when the Devries had moved in. She stated that the penetration caused her pain, that she had blood on her underwear, and that defendant left bruises on her legs. J.'s mother also testified to seeing the blood and bruises. As to the other two incidents, she testified that they occurred when she was between five and seven

12

years old. She did not explicitly testify as to where they happened, but the context of her testimony makes clear that they happened either at defendant's residence on Barcelona Court or the Does' residence on Eagle View Way.

As to the use of force, J. testified that she struggled against defendant "most of the time," requiring defendant to grab her ankles, feet, or legs to restrain her or physically bring her into his bedroom. She also testified that defendant told her on multiple occasions that if she did not let him touch her, he would molest Carlos. A jury could reasonably find this constituted duress. (*People v. Senior* (1992) 3 Cal.App.4th 765, 775 [duress includes a threat of retribution sufficient to coerce a reasonable person of ordinary susceptibilities to submit to an act to which one otherwise would not have submitted].) We conclude that under the guidance set forth in *Jones*, *supra*, 51 Cal.3d at pages 315-316, this testimony is sufficient evidence by which a rational juror could find defendant guilty on Counts Eleven through Thirteen.

3. *Sufficiency of the Evidence Supporting Counts One Through Ten*

Defendant also contends the evidence was insufficient to support convictions in Counts One through Ten, on which he was convicted of lewd or lascivious acts on a child under 14 by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. (§ 288, subd. (b).) To prove these counts, the prosecution was required to show: (1) defendant willfully touched the victim's body, either on bare skin or through clothes; (2) defendant used force, violence, duress, menace, or fear of immediate unlawful bodily injury; (3) that he committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the victim; and (4) the victim was under the age of 14 at the time of the act.

The victim's testimony on these counts was somewhat nonspecific, particularly with respect to the number of times they occurred. She variously testified that the touching incidents continued "for a really long time," that they happened "a lot," that "I couldn't give an amount," and that they happened "[e]nough to not be able to keep count

13

or remember specific times." However, when the prosecutor asked J. specifically whether the touching happened at each age, she testified that it happened at each of the ages of three through seven.

The California Supreme Court's guidance set forth in *Jones* requires that the "victim must describe *the number of acts committed with sufficient certainty to support each of the counts alleged* in the information or indictment (e.g., 'twice a month' or 'every time we went camping')." (*Jones*, *supra*, 51 Cal.3d at p. 316, italics added.) Phrases such as "a lot" or "a really long time" do not suggest specific numbers with any degree of certainty. The Attorney General points to the victim's testimony that it happened "enough not to be able to keep count or [to] remember specific times," but this too does not suggest any specific number. The record does not show whether the victim had the capacity to keep count at the time of the incidents, and she had no independent recollection at trial of specific touching incidents apart from the incidents of penetration. Based on this record, we can discern no rational basis upon which a jury could specifically conclude the defendant committed ten lewd or lascivious acts against the victim.

Nonetheless, J. testified that the touching occurred at each of the separate ages three through seven. This provides an evidentiary basis on which a jury could rationally conclude defendant touched J. at least once per year during that time frame, and hence that he touched her on at least five separate occasions. (See *Jones*, *supra*, 51 Cal.3d at p. 315 [testimony as to the frequency of the incidents, such as "twice a month" or "every time we went camping" is sufficient to establish a number].) However, the dates of the defendant's and the victim's respective birthdays shows defendant was under 18 years old when J. was three. Thus, any acts committed against J. when she was three years old would have preceded the charged time frame of December 3, 1997 (defendant's eighteenth birthday) through December 31, 2000. The remaining evidence supports at least one lewd act per year at each of the ages four through seven. We therefore conclude

14

the record supports convictions for four separate lewd or lascivious acts. Accordingly, sufficient evidence supports convictions on Counts One through Four, but we will order the convictions on Counts Five through Ten stricken.

The dissent points to J.'s testimony that the molestations happened "[a] lot. Enough to not be able to keep count or remember specific times. It just keeps happening." (Dissenting opn. at p. 3.) We do not think this testimony satisfies *Jones*' requirement of evidence of a "number of acts committed with sufficient certainty" to support ten separate counts. (*Jones*, *supra*, 51 Cal.3d at p. 316.) But even assuming that standard was met, the dissent does not address the additional requirement that the evidence must show "that such conduct occurred during the limitation period." (*Ibid.*) The charging period for all ten counts began December 3, 1997, when defendant turned 18 years old. The victim testified that defendant began molesting her when she was "[m]aybe three, maybe younger"—*a time period preceding December 3, 1997.*[3] The prosecution presented no evidence from which the jury could infer that defendant molested her more than once a year *on or after December 3, 1997.* For these reasons, we are not persuaded that the evidence supports more than four separate lewd acts.

B. *Admission of Carlos' Testimony Under Evidence Code Section 1108*

Defendant contends the trial court violated his due process rights and his right to a fair trial by admitting Carlos' testimony concerning defendant's prior acts of molestation. The Attorney General contends admission of the testimony was proper. We conclude the trial court acted within its discretion to admit Carlos' testimony.

1. *Procedural Background*

---

[3] The dissent states that the victim testified she was first molested when she was four. (Dissenting opn. at p. 4.) But as noted, J. testified that she was three or younger when defendant first began molesting her.

15

The prosecution moved in limine to admit Carlos' testimony under Evidence Code section 1108 (section 1108). Defendant moved to exclude the evidence under Evidence Code section 352. Defendant argued the testimony was highly prejudicial and would violate his right to a fair trial.

The trial court found the testimony to be "really, really probative." The court found the possibility of prejudice to be significant but outweighed by the probative value of the evidence. Furthermore, the court found the jury was likely to adhere to limiting instructions concerning the evidence. Accordingly, the court granted the prosecution's motion.

The court instructed the jury using CALCRIM No. 1191, as follows: "The People presented evidence that the defendant committed the crime of lewd and lascivious act on a child, specifically on Carlos Doe, that was not charged in this case. This crime is defined elsewhere for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses and, based on that decision, also conclude that the defendant was likely to commit and did commit the offenses charged in Counts 1 through 13. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the offenses charged in Counts 1 through 13. The People must still prove each charge beyond a reasonable doubt. Do

not consider this evidence for any other purpose except the limited purpose of determining the defendant's credibility."

2. *Legal Principles*

Subdivision (a) of section 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The California Supreme Court has instructed trial courts to apply section 1108 as follows: "By reason of section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 916-917 (*Falsetta*).)

"Like any ruling under [Evidence Code] section 352, the trial court's ruling admitting evidence under section 1108 is subject to review for abuse of discretion." (*People v. Story* (2009) 45 Cal.4th 1282, 1295.)

17

3. *The Trial Court Did Not Err in Admitting Carlos' Testimony*

Defendant's primary contention is that the admission of testimony under section 1108 violated his constitutional rights to due process and a fair trial. The California Supreme Court rejected this argument in *Falsetta*, *supra*, 21 Cal.4th at page 916. We too must reject defendant's claim, as we are bound by decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d 450.)

Second, defendant contends the trial court abused its discretion under section 352. Defendant argues that his prior acts against Carlos were not interwined in any fashion with the charged conduct against J.; that the prior acts were dissimilar and remote in time; that they did not constitute impeachment; and that the prosecution had alternative means of proving propensity. We disagree. The evidence showed that defendant molested both Carlos and J. during the same time period and at the same locations. As a method of coercing J. into compliance, defendant threatened to molest Carlos if J. did not submit. Carlos's testimony corroborated J.'s testimony on this point. The probative value of the testimony was thereby significant, outweighing the danger of prejudice. Furthermore, defendant testified at trial, allowing the prosecution to impeach him with his prior conviction. Finally, the trial court instructed the jury to consider the testimony for limited, permissible purposes. Absent a showing to the contrary, we presume the jury properly followed these instructions.

On this record, we conclude the trial court acted within its discretion to admit Carlos's testimony under section 1108 and did not abuse its discretion under section 352.

C. *Exclusion of Evidence That J. Fabricated a Claim Against Her Father*

Defendant contends the trial court erred by excluding evidence that J. once falsely reported to police that her father had beaten her. The Attorney General argues that the trial court's ruling did not constitute an abuse of discretion. We conclude the trial court acted within its discretion by excluding evidence of the incident.

18

1. *Factual and Procedural Background*

During oral argument on in limine motions, defendant proffered evidence based on a Gilroy Police Department report and a statement from Child Protective Services (CPS) concerning an allegation by J. against her father in 2008. Defense counsel argued that the incident was relevant to J.'s credibility because it showed she had previously lied to law enforcement. Counsel proposed to subpoena the police officers in the report and question them about the incident.

The trial court reviewed the records and characterized them as follows: "[I]t consists of a CPS narrative and that staff person is P-H-U-M and N-G-U-Y-E-N. It states that the CPS worker privately interviewed J., and then he used the word that they assessed that J. tried to manipulate the interview by, quote, painting a bad picture, unquote. [¶] And then J. describes being kicked in the leg by her father. CPS worker Nguyen interviewed each of the parents separately, presumably, and they both denied that there was physical contact. And then CPS Worker Nguyen declared the incident to be unfounded under his or her conclusion. [¶] Attached to that is the police reports from the Gilroy [*sic*] or at least one incident report from Gilroy Police Department that is about four pages. And Officer Dutton reports a similar interview with J. and then Officer Moore a [*sic*] is reported . . . to have taken photographs of J.'s injuries, including slight redness . . . There's speculation as to whether or not that might have happened when she left the house as dramatically as she did."

The court found the evidence would not be helpful to the jury because it was ambiguous as to whether J. had actually lied. Furthermore, the court found that the incident did not concern any allegation of sexual abuse; rather, it concerned an allegation of simple physical contact—that J. had been kicked in the shin. Finally, the court concluded that it would take excessive time, requiring testimony from J., her father, the police, and the CPS worker, all "for the jury to be presented with what is ultimately

19

ambiguous information and ultimately not very helpful." Accordingly, the trial court excluded the evidence under Evidence Code section 352.

## 2. *Exclusion of the Alleged Incident Was Not an Abuse of Discretion*

An appellate court applies the abuse of discretion standard of review to a trial court's ruling on the admissibility of evidence, including a ruling under Evidence Code section 352 to exclude evidence on the ground that its probative value is substantially outweighed by the possibility of undue consumption of time. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1449.) Under this standard, the trial court did not abuse its discretion.

Testimony on the incident in question—which did not involve any allegations of sexual assault—would have presented a modest degree of probative value at best. The proffered evidence did not clearly establish whether J. had lied, but instead concerned other witnesses' opinions about her truthfulness. The court accurately observed that evidence of the event would involve taking testimony from several different witnesses, including police officers and a CPS employee having no other connection to the underlying charges against defendant. On balance, the probative value of the evidence was substantially outweighed by the possibility of undue consumption of time. Accordingly, the court acted within its discretion by excluding evidence of the incident.

The defendant further argues that exclusion of the evidence violated his federal constitutional rights to present a defense and to cross-examine the victim under the Confrontation Clause of the Sixth Amendment. (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673; *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 [the right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable].) But, as the United States Supreme Court has observed, "It does not follow [. . .] that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679.)

The trial court's exclusion of the "marginally relevant" evidence at issue here fell well within the bounds of that "wide latitude." Furthermore, defendant proposed to do far more than mere cross-examination based on the proffered evidence. As defense counsel noted pretrial, the evidence would require him to call police officers having no connection to the charged offenses. The trial court did not violate defendant's constitutional rights by excluding such witnesses.

D. *Cruel and Unusual Punishment*

Defendant contends that his sentence of 105 years to life violates the prohibition against cruel and unusual punishments in the Eighth Amendment of the United States Constitution. Because we will remand this matter for resentencing based on the grounds set forth above, this claim is rendered moot.

E. *Restraining Order*

Defendant contends the trial court lacked the authority to issue a restraining order at the time of sentencing. The Attorney General contends the trial court properly issued the order under section 1202.05. We conclude the order was unauthorized.

1. *Procedural Background*

On July 5, 2012, the trial court issued a pretrial restraining order under section 136.2 to last until July 5, 2013. At sentencing on April 19, 2013, the court issued "a ban on visitation between the complaining witness in this case and the defendant while he's confined." The court did not specify any statutory basis for the order, and the court did not specify whether the instant order was a modification of the existing restraining order. But a notation on the minutes of the sentencing hearing states that the order "remains," apparently in reference to the preexisting order.

2. *The Restraining Order Was Unauthorized*

As an initial matter, we reject the Attorney General's position that the restraining order was issued and authorized under section 1202.05. First, nothing in the record supports the contention that that court issued the order under section 1202.05. The court made no reference to any statutory authority in its oral pronouncement, and none is indicated in the minutes. But even if the court had cited section 1202.05, that section does not provide authority for the restraining order issued here. Section 1202.05 provides, in relevant part: "Whenever a person is sentenced to the state prison on or after January 1, 1993, for violating Section 261, 264.1, 266c, 285, 286, 288, 288a, 288.5, or 289, and the victim of one or more of those offenses *is a child under the age of 18 years*, the court shall prohibit all visitation between the defendant and the child victim." (Italics added.) As held by this court, the plain language of this statute states that it applies only when the victim is under 18 at the time of sentencing, or more precisely, at the time of the contemplated contact. (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1313.) The victim here was 19 years old at the time of sentencing. Accordingly, the trial court had no authority to issue a restraining order under section 1202.05.

Defendant argues that the trial court modified the existing restraining order, which had been issued under section 136.2. The record supports this contention, based on the minute order of the sentencing hearing indicating that the prior order "remains." Defendant also argues that section 136.2 provides no authority for the restraining order here. The Attorney General concedes this point, and we accept the concession.

Under section 136.2, subdivision (a), courts are authorized to issue protective orders that are operative only during the pendency of the criminal proceedings and as prejudgment orders. (*People v. Selga* (2008) 162 Cal.App.4th 113, 119.) Post-judgment protective orders are authorized under subdivision (i) of section 136.2, but only for

defendants convicted of certain crimes, e.g. domestic violence.[4] As a general matter, trial courts have no authority to issue a restraining order at sentencing. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 996 (*Robertson*) [trial court had no statutory authority to issue a no-contact order at sentencing]; *Babalola v. Superior Court* (2011) 192 Cal.App.4th 948; *People v. Stone* (2004) 123 Cal.App.4th 153.)

Accordingly, the trial court's order restraining order was unauthorized. We will order it stricken.

### III.    DISPOSITION

The judgment is reversed and the matter is remanded. On remand, the trial court shall strike the convictions and sentences on Counts Five through Ten and strike the restraining order. The trial court shall resentence defendant on the remaining counts.

---

[4] While the current version of the statute allows for post-judgment restraining orders when the defendant is convicted of a crime requiring registration as a sex offender, the version of the statute in effect at the time of sentencing contained no such provision. The Attorney General does not argue that we should apply this statute retroactively.

23

_____
Márquez, J.

I CONCUR:


_____
 Rushing, P. J.

ELIA, J., Dissenting

Respectfully, I dissent.  My review of the record supports the conclusion that all counts of forcible lewd and lascivious acts on a child under 14 (Pen. Code, § 288, subd. (b)) were supported by sufficient evidence.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

In *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), the California Supreme Court recognized that "[c]hild molestation cases frequently involve difficult, even paradoxical, proof problems," and that "[a] young victim . . . assertedly molested over a substantial period by [an adult] may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents."  (*Id.* at p. 305.) Stating that "even *generic* testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific,* albeit undifferentiated, incidents, each of which amounts to a separate offense, and each of which could support a separate criminal sanction" (*id.* at p. 314, italics added, some italics omitted) the Supreme Court addressed the issue of what constitutes "the minimum

quantum of proof necessary to support a conviction on one or more counts based on such generic testimony." (*Ibid.*) In this regard, the *Jones* court explained that, "in determining the sufficiency of generic testimony, we must focus on factors other than the youth of the victim/witness. Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction." (*Id.* at p. 315.)

After an exhaustive review of conflicting case law on the issue, in *Jones* the Supreme Court held that, to establish the substantiality of the victim's testimony in child molestation cases, "three minimum prerequisites" (hereafter the three *Jones* prerequisites) must be satisfied. (*Jones*, *supra*, 51 Cal.3d at pp. 305-313, 321.) First, "[t]he victim . . . must describe the *kind of act or acts committed* with sufficient specificity, both to [ensure] that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy)." (*Id.* at p. 316.) Second, "the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')." (*Ibid.*) Third and last, "the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to [ensure that] the acts were committed within the applicable limitation period." (*Ibid.*) The *Jones* court added that "[a]dditional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Ibid.*)

Thus, *Jones* explained, if the testimony of the victim in a child molestation case is generic but specifies "the *type of conduct* involved . . . and *its frequency* . . . and confirm[s] that such conduct *occurred during the limitation period*, [then n]othing more

2

is required to establish the substantiality of the victim's testimony." (*Jones*, *supra*, 51 Cal.3d at p. 316, italics added.)

The majority takes issue with the evidence of the number of times that the lewd acts occurred. In this case, appellant was charged with 10 counts of forcible lewd or lascivious acts on a child under 14 years. At the time of trial J. Doe was 20 years old. She testified that she was molested by appellant between the ages of three and six. She remembered being touched by appellant at the Barcelona Court address; this touching continued for several years, until she was seven. At one point the prosecutor asked J. if it was "fair to say" that appellant had "touched [her] a lot of times over those years[,]" J. responsed "[t]hat's fair to say." When the prosecutor asked J. if appellant would touch her vagina without putting his fingers inside her, she confirmed that he had. When asked if it had happened "a lot," J. confirmed that it had. J. confirmed that it happened when she was five, six, and seven. When asked by the prosecutor if she could "even begin to tell [the court] how many times [appellant] touched [her] vagina without [appellant] putting his fingers inside" her, J. responded that she could not "give an amount." When the prosecutor asked J. if it was "dozens and dozens" of times, J. responded, "A lot. Enough to not be able to keep count or remember specific times. It just keeps happening." Whether J. intended that comment literally or metaphorically, it constitutes evidence of sustained and continuous sexual abuse.[1] Later, when defense counsel cross examined J. about some of her preliminary hearing testimony, J. confirmed that she had testified that as a reward for cooperating in the molestations, appellant had given her gummy worms. When asked by defense counsel if appellant had given her gummy worms on "numerous" occasions, J. confirmed that he had. On redirect, the prosecutor

---

[1] Jade's mother confirmed that while appellant was living on Barcelona Court he babysat J. during the time that she was five, six, and seven. She further confirmed that there were times when her family spent the night at the Barcelona Court house.

asked J. if she was first molested when she was four, J. responded "[t]hrough the time, yeah."

Here, the prosecutor presented a conservative charge of 10 counts of molestation occurring over a three-year time period when J. was four until she was seven. J.'s testimony suggests that the molestations occurred not just once at age four, five, six, and seven, but many, many times over that three-year period—so many times that it was impossible for J. to put an exact number on it. This does not reflect insufficiency of the evidence—rather, it reflects sensible charging by the prosecution. (See *Jones*, *supra*, 51 Cal.3d at p. 314 [It must be remembered that even generic testimony outlines a series of *specific,* albeit undifferentiated, incidents *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction. Of course, prosecutors should exercise discretion in limiting the number of separate counts charged. No valid purpose would be served by charging hundreds or thousands of separate counts of molestation, when even one count may result in a substantial punishment].) In light of J.'s testimony describing sustained and continual sexual abuse over a three-year period, a rational trier of fact could have concluded that at least 10 counts occurred.

As one appellate court noted, "Multiple sex offenses committed by adults upon immature and inarticulate children over a long period of time are very likely to result in an amalgamation of the crimes in the child's mind. The child is unlikely to be able to give any testimony approximating the date of any one separately describable offense even in the uncomplicated case. Where the number of offenses is so numerous even an adult would not be able to count them, the child's testimony will often be reduced to a general, and customarily abbreviated, recitation of what happened on a continuing basis." (*People v. Luna* (1988) 204 Cal.App.3d 726, 748, disapproved on another ground in *Jones*, *supra*, 51 Cal.3d at p. 322.) This is more so when the child victim is testifying many years later as an adult to what happened years before when she was a child.

Given this court's limited role on appeal, appellant bears an enormous burden in claiming there was insufficient evidence to sustain his 10 molestation convictions under Penal Code, section 288, subdivision (b)(1).  If the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact's findings and not retry the case ourselves.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  Applying this standard of review, I conclude the record discloses sufficient evidence to support appellant's conviction on counts 1 through 10.  Accordingly, I respectfully dissent.

_____

ELIA, J.